IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

TODD L. WRIGHT                                )
                                              )
v.                                            )        No. 3:05-0969
                                              )        JUDGE CAMPBELL
MIDDLE TENNESSEE ELECTRIC                     )
MEMBERSHIP CORPORATION                        )

MEMORANDUM

Pending before the Court is Defendant's Motion for Summary Judgment (Docket No. 13)

and Plaintiff's Motion for Summary Judgment (Docket No. 17).   For the reasons stated herein,

Defendant's Motion (Docket No. 13) is DENIED and Plaintiff's Motion (Docket No. 17) is

DENIED.

FACTS

Todd L. Wright ("Plaintiff") filed this action (Docket No. 1) against Middle Tennessee

Electric Membership Corporation ("Defendant") alleging employment discrimination, in

violation of the Americans With Disabilities Act of 1990, 42 U.S.C. §12101, et seq. ("ADA").

Plaintiff was employed by Defendant for 18 years, and, for over 10 years, held the

position of lineman (Docket No. 22 at 2).  Defendant has six (6) job categories: officials and

managers, professional, technical, clerical, craft and meter readers (Docket No. 22 at 2).

Plaintiff's position of lineman was in the "craft" category of jobs.  The essential functions of the

lineman job include climbing, lifting, bending, squatting, climbing poles, and climbing in and

out of bucket trucks (Docket No. 22 at 3).  Other jobs classified by Defendant in the "craft"

category include groundman and laborer positions (Docket No. 22 at 3).

On June 4, 2004, Plaintiff suffered a torn meniscus in his right knee while working for

Defendant (Docket No. 22 at 3).  Plaintiff was treated by Dr. Kaelin ("Kaelin") for his right-knee

injury (Docket No. 22 at 4).  Defendant paid Plaintiff his full salary for the first thirteen (13)

weeks following his right-knee injury, after which Plaintiff was considered separated from

Defendant's employ (Docket No. 22 at 5 and 6).  An employee on "separated status" is an

employee who has not returned to work with Defendant within thirteen (13) weeks of his or her

injury and is on long-term disability (Docket No. 22 at 6).  In September, 2004, after the first

thirteen (13) weeks following his right-knee injury, Plaintiff received long term disability

benefits and workers' compensation benefits (Docket No. 22 at 6).   On November 17, 2004,

Kaelin released Plaintiff to work, although it is disputed whether Plaintiff was released to "light

duty" work or was released to return to work with specific, limited restrictions (Docket No. 22 at

7).  On December 13, 2004, Defendant received a work status report from Kaelin indicating that

Plaintiff could return to light duty work, but with restrictions.  These restrictions were that

Plaintiff could stand and walk for only four hours in a eight hour work day, but that Plaintiff

could sit the entire work day.  Plaintiff was also completely restricted in his ability to bend,

squat, kneel and climb, and had restrictions on the frequency in which he could lift 11-20 lbs.

(frequently), and further restrictions on his ability to lift 21-50 lbs. (occasionally) (Docket No.

20-4 at 25).  It is unclear from the Kaelin's notes on the work status report whether the

restrictions placed upon Plaintiff were permanent restrictions or were to remain only until

Plaintiff's next follow-up visit, which the work status report indicates was in four weeks (Docket

No. 20-4 at 25).  On March 8, 2005, Plaintiff was released from Kaelin's medical care (Docket

No. 16-10 at 1).  The Order of Compromise and Settlement entered in Plaintiff's worker's

compensation case indicated that Kaelin rated Plaintiff a 10% impairment to the right lower

extremity and returned Plaintiff to light duty with permanent restrictions of no lifting or carrying

over 25 lbs. with only occasional bending, squatting, kneeling and climbing (Docket No. 16-9 at 2).

On December 7, 2004, Defendant met with Plaintiff and his wife at their home for about an hour (Docket No. 22 at 12 and 13).  At the meeting, Plaintiff told Defendant that he could not perform the essential functions of the lineman job (Docket No. 22 at 13).  More specifically, Plaintiff told Defendant that he could not climb, bend, squat or lift (Docket No. 22 at 14). Plaintiff further told Defendant that he had permanent restrictions as to what jobs he could perform, but said that he was willing to take "some lighter type of job" (Docket No. 22 at 16). At the meeting, Defendant and Plaintiff also discussed a groundman job, another "craft" position, as well as a meter reading job (Docket No. 22 at 14).  It is undisputed that with respect to the groundman job, Plaintiff said he could not stand and walk all day, and with respect to the meter reading job, Plaintiff said he could not run away from a dog if he encountered one (Docket No. 22 at 14-15).  It is disputed, however, whether Plaintiff was interested in the groundman or meter reader jobs (Docket No. 22 at 15-16).   At the December 7, 2004 meeting, Defendant also offered to send Plaintiff for a second opinion, but Plaintiff refused Defendant's offer (Docket No. 22 at 17).

On January 7, 2005, Defendant again met with Plaintiff and Plaintiff's wife in the office of Defendant's president, Frank Jennings ("Jennings") at Defendant's corporate headquarters (Docket No. 22 at 18).  It is undisputed that at the meeting Plaintiff again told Defendant that he could not perform the lineman job (Docket No. 22 at 18).  At the meeting, Jennings told Plaintiff that Defendant had no job openings for him until he was released from medical care (Docket No. 22 at 19).  It also is undisputed that Jennings told Plaintiff that Defendant would give Plaintiff

3

first priority for any available job if Plaintiff was qualified for the position (Docket No. 22 at 19). At the meeting, Defendant's employee, Shannon Kaprive ("Kaprive"), also told Plaintiff about a control center position that had become available in December, 2004, but that had already closed by January 7, 2005, and indicated that Plaintiff may be qualified for that position (Docket No. 22 at 19-20). While it is undisputed that the control center position became available in December, 2004 and had already closed by January 7, 2005, it is disputed, however, whether Plaintiff told Kaprive that he would take the position or that he would consider the position (Docket No. 22 at 20). In addition, it is undisputed that Kaprive told Plaintiff that she would contact him if jobs became available (Docket No. 22 at 32). Furthermore, it is disputed whether Plaintiff expressed a desire at the meeting to be placed in a meter reading job, among others (Docket No. 22 at 18). Finally, while Plaintiff knew that ordinarily he would have to apply for a new job position, it is disputed whether Jennings told Plaintiff that he would have to apply for a job or if Defendant would call if a position became available (Docket No. 22 at 19).

On the evening of January 7, 2005, Plaintiff also called Gordon Bone ("Bone"), chairman of Defendant's Board, and told him that he would take the control center position (Docket No. 22 at 21). It is disputed, however, whether Bone communicated with Defendant about Plaintiff's interest in the position and other jobs or whether Bone told Plaintiff he should speak to Jennings and Kaprive about his job interests (Docket No. 22 at 21).

It is undisputed that Defendant does not offer light duty work because of the sensitive nature of its work, and makes no exceptions to its policy of not offering "light duty" work (Docket No. 22 at 8 and 9). It also is undisputed that Defendant will not consider an injured employee for any job position until the employee has a full medical release (Docket No. 25 at 4-

4

5).  It remains disputed whether this full release must be to the same position that was held prior

to injury and whether this policy amounts to a "100% healed" rule (Docket No. 25 at 4-5).  It is

disputed whether Defendant's clerical and administrative positions are safety sensitive and

whether Plaintiff requested an accommodation other than to be placed in a lighter duty job

(Docket No. 22 at 27).

Plaintiff filed an EEOC charge on February 7, 2005 (Docket No. 22 at 22).

Plaintiff did not request to be returned to work after his March 8, 2005 release from

medical care by Kaelin (Docket No. 22 at 24).  In October, 2005, Defendant notified Plaintiff of

an opening for a clerk position, but Plaintiff did not respond to the notice of opening because it

did not pay enough (Docket No. 22 at 24-25).  In November, 2005, Defendant notified Plaintiff

of an opening for a control center position (Docket No. 22 at 25).  It is disputed whether this was

the first opening for a control center position since the December, 2004 control center opening,

but it is undisputed that Plaintiff did not respond to the notice of the opening for the control

center positions because he had already filed his EEOC charge (Docket No. 22 at 24, 26).

Defendant sent Plaintiff notice of another opening for a clerk position in November, 2005, but

Plaintiff did not respond to the notice because the position did not pay enough (Docket No. 22 at

26).  It is undisputed that Plaintiff also knew he could find Defendant's job listings on the

internet (Docket No. 22 at 32).

With respect to Plaintiff's physical condition, it is undisputed that Plaintiff can: 1) walk

from a quarter to half a mile; 2) can walk up and down steps; 3) went turkey hunting in the year

2006; 4) can stand for a least 30 minutes; 5) can lift 50 pounds; 6) earns money mowing yards

and doing farm work; and 7) has no problem in reaching, hearing dressing, seeing, eating,

breathing, sleeping, vacuuming, dusting, preparing meals and bathing (Docket No. 22 at 39). If Plaintiff has pain in his knee while walking, Plaintiff sits down from 5 to 15 minutes, and then gets up and starts walking again (Docket No. 22 at 34).

On November 9, 2005, Plaintiff filed his Complaint (Docket No. 1) in this matter. In his Complaint, Plaintiff alleges that Defendant failed to place him in one or more available jobs that he could perform, with or without reasonable accommodation, and has failed and refused to reasonably accommodate his disability in violation of the ADA. In addition, Plaintiff asserts that Defendant has failed to engage in an interactive process with him designed to identify reasonable accommodations of his disability or perceived disability and has failed and refused to contact him when one or more jobs that he could fully perform with or without reasonable accommodation became available. Plaintiff also alleges that Defendant retaliated against him for opposing disability discrimination by refusing to place him in one or more available jobs that he could perform, with or without reasonable accommodation. Finally, Plaintiff alleges that Defendant has refused to create or fashion a special job for Plaintiff when it has created or fashioned special jobs for other employees.

In response to Plaintiff's complaint, Defendant has moved for summary judgment (Docket No. 13) alleging that Plaintiff cannot establish that he had a disability within the meaning of the ADA. Defendant also asserts that Plaintiff has failed to show that he was an "otherwise qualified individual" within the meaning of the ADA. In addition, Defendant asserts that Plaintiff has failed to establish that Defendant took any adverse employment action against him solely because of his disability. Finally, Defendant argues that Plaintiff has failed to establish that Defendant retaliated against him.

6

Plaintiff also has moved for summary judgment (Docket No. 17) alleging that

Defendant's "no light duty work" or "100% healed" rule is a *per se* violation of the ADA.

## SUMMARY JUDGMENT

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law."   Fed. R. Civ. P. 56(c); Meyers v. Columbia/HCA Healthcare Corp., 341 F.3d

461, 466 (6th Cir. 2003).  In deciding a motion for summary judgment, the court must view the

factual evidence and draw all reasonable inferences in favor of the nonmoving party. Id.; Hopson

v. DaimlerChrysler Corp., 306 F.3d 427, 432 (6th Cir. 2002).

To prevail, the non-movant must produce specific evidence that demonstrates there is a

genuine issue of material fact for trial.  Meyers, 341 F.3d at 466.  A mere scintilla of evidence is

insufficient; there must be evidence on which the jury could reasonably find for the non-movant.

Id.  The non-moving party may not rest on mere allegations but must set forth specific facts

showing that there is a genuine issue for trial.  Hopson, 306 F.3d at 432.

## ANALYSIS

The ADA prohibits employment discrimination "against a qualified individual with a

disability."[1]  42 U.S.C. §12112(a).   In order to establish an ADA claim, Plaintiff must show that

he: (1) has a disability; (2) is qualified to perform the job requirements with or without

reasonable accommodation; and (3) that he was denied a reasonable accommodation.  Penny v.

---

[1]"Qualified individual with a disability" is defined as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. §12111(8).

United Parcel Service, 128 F. 3d 408, 414 (6th Cir. 1997) (citing 42 U.S.C. §12112(b)(5)(A));

Wohler v. Toledo Stamping & Mfg. Co., 125 F. 3d 856 (6th Cir. 1997); 1997 WL 603422 at **6

(6th Cir. Sept. 30, 1997)).  A plaintiff may prove his ADA case either through direct or indirect

evidence.  Hedrick v. Western Reserve Care System, 355 F. 3d 444, 452 (6th Cir. 2004).  In the

present case, Plaintiff seeks to establish his prima facie case indirectly.  When a plaintiff seeks to

establish his case indirectly, he must show that: 1) he is disabled; 2) he is otherwise qualified for

the position, with or without reasonable accommodation; 3) he suffered an adverse employment

decision; 4) the employer knew or had reason to know of his disability; and 5) the position

remained open while the employer sought other applicants or the disabled individual was

replaced.  Id. at 453.  In the present case, Defendant disputes the first three elements of

Plaintiff's prima facie case.

Defendant first argues that Plaintiff cannot establish that he had a disability within the

meaning of the ADA.  More specifically, Defendant asserts that Plaintiff's diagnosis of a medial

meniscus tear in his right knee is insufficient to establish that he has an impairment under the

ADA in that the injury does not substantially limited Plaintiff's ability to walk or perform any

other major life activity.

In response to Defendant's assertions, Plaintiff asserts that he is either significantly

limited in, or completely precluded from performing the everyday activities that he used to

perform, including kneeling, bending, squatting, climbing, lifting, twisting, performing manual

tasks, performing household chores, walking, driving, participating in family vacations, playing

with his children, riding horses and motorcycles, and "every-day activities."  Plaintiff also

asserts that he is precluded from performing a class of jobs or a broad range of jobs in various

8

classes as compared to the average person with his particular skill set, including jobs that required climbing, kneeling, excessive bending, squatting and heavy lifting.

In order to proceed with his ADA claim, Plaintiff must meet the threshold burden of showing that he is a "disabled" individual within the meaning of the ADA. Under the ADA, a "disability" is defined in three ways: (A) a physical or mental impairment that substantially limits one or more of the major life activities of an individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment. 42 U.S.C. §12102(2).

"Substantially limits," as used in the definition of "disability" means either the inability to perform a major life activity or a significant restriction on the ability to perform a major life activity as compared to the general population. 29 C.F.R. §1630.2(j).

The EEOC has directed that "major life activities" are those basic activities, such as walking, seeing, hearing, speaking, breathing, learning and working, that the average person in the general population can perform with little or no difficulty. 29 C.F.R. §1630.2(i); Freund v. Lockheed Missiles and Space Co., Inc., 930 F. Supp. 613, 617 (S.D. Ga. 1996). "A mere degradation of a major life activity, however, does not amount to a disability under the ADA." Id. Furthermore, impairment which merely prevents an individual from performing a particular job is not "substantially limiting" within the meaning of the ADA because the impairment must foreclose generally the type of employment involved. Watson v. Cencom Cable Income Partners, 993 F. Supp. 1149 (M.D. Tenn. 1997).

In the present case, the Court finds that questions of fact remain whether Plaintiff is significantly limited in or completely precluded from performing the everyday activities that he used to perform or that he is precluded from performing a class of jobs or a broad range of jobs

9

in various classes. The record before the Court is disputed on whether the only life activities that were compromised by Plaintiff's impairment were his ability to lift over 25 lbs., his ability to bend, squat, kneel and climb without limitation, or whether Plaintiff remains restricted as to his ability to stand and walk after his March 8, 2005 medical release date (Docket Nos. 20-4 at 25 and 22 at 7). While it is undisputed that Plaintiff can walk from a quarter to half a mile, can walk up and down steps, went turkey hunting in the year 2006, can stand for a least 30 minutes, can lift 50 pounds, earns money mowing yards and doing farm work, has no problem in reaching, hearing dressing, seeing, eating, breathing, sleeping, vacuuming, dusting, preparing meals and bathing, there is evidence that Plaintiff incurs pain after walking and must rest 5 to 15 minutes before he can walk further (Docket No. 22 at 34). In addition, if Plaintiff is in fact permanently restricted in his ability to walk and stand more than four hour a work day as indicated in Kaelin's December 13, 2004 report, then such restrictions could have the effect of foreclosing Plaintiff's ability to perform the essential functions of Defendant's other "craft" or laborer type positions. Without undisputed evidence of the specific limitations placed upon Plaintiff or the job requirements of Defendant's other "craft" or "laborer" positions, the Court cannot grant summary judgment on the ground that Plaintiff is not disabled within the meaning of the ADA.

Defendant also asserts that Plaintiff cannot establish that he was an "otherwise qualified individual." More specifically, Defendant asserts that Plaintiff was not an otherwise qualified individual before March 8, 2005 because he was not released from medical care and returned to work prior to that date. Defendant also asserts that Plaintiff was not an otherwise qualified individual because he has not shown that he was qualified for the lineman job or for the other job

10

positions he desired, and that he rejected Defendant's reasonable accommodations. In addition, Defendant asserts that Plaintiff failed to establish that he was an "otherwise qualified individual" in that Plaintiff failed to propose a reasonable accommodation for his knee injury and failed to identify and propose vacant job positions. Finally, Defendant asserts that Plaintiff failed to establish that he was an "otherwise qualified individual" in that it attempted to accommodate Plaintiff by offering him re-assignment.

In response to Defendant's arguments, Plaintiff asserts that he was otherwise qualified to perform the essential functions of the job positions he desired, with or without reasonable accommodation. More specifically, Plaintiff argues that even with his limited restrictions, he could fully perform many of Defendant's clerical jobs, including the dispatcher job that became available in December, 2004, among others. Plaintiff further argues that Defendant cannot claim that Plaintiff was not released to return to work within his limited restrictions in November, 2004 when Kaelin released him to any type of light duty work. Plaintiff also argues that Defendant's claim that he did not apply for jobs fails because Defendant admits that it would not have considered his application even if he had applied, and Defendant's claim that Plaintiff could not perform the essential functions of the clerical jobs like the dispatcher job fails in light of Defendant's admission that Plaintiff was qualified for the job. Furthermore, Plaintiff asserts that Defendant's claim that he rejected alleged reasonable accommodation fails because Defendant never offered him any jobs before he filed his EEOC charge in February, 2005, and that Defendant's attempt to offer him a job in November, 2005 does not exonerate Defendant from its liability under the ADA. Finally, Plaintiff argues that the record reflects that he proposed to Defendant reasonable accommodations in the form of specific jobs he could perform as well as

11

jobs that fell within his limited restrictions, but that Defendant refused to consider him for any such job because he did not have a release to return to the lineman job.

In further response to Defendant's Motion, Plaintiff has also filed his own Motion for Summary Judgment (Docket No. 17) alleging that Defendant's "no light duty work" or "100% healed" rule is a *per se* violation of the ADA.

In addition to showing that he is disabled under the ADA, Plaintiff must also show that he was an "otherwise qualified individual" within the meaning of the ADA and that he was denied a reasonable accommodation. Penny, 128 F. 3d at 414. A "qualified individual with a disability" is defined in Title I of the ADA as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. §12111(8).

The term "reasonable accommodation" is defined under agency regulations to mean modifications or adjustments to the work environment, including job restructuring and reassignment to a vacant position, that enables a qualified individual with a disability to enjoy equal employment opportunities as other similarly situated employees without disabilities. Wohler, 1997 WL 603422 at **6. For purposes of the prima facie case, Plaintiff must merely suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits. Id. The reasonableness of an accommodation is a question of fact. Berry v. City of Savannah, 1999 WL 196557 at **4 (6th Cir. April 1, 1999); Cassidy v. Detroit Edison Co., 138 F. 3d 629, 634 (6th Cir. 1998). A disabled employee bears the initial burden of proposing an accommodation and showing that it is objectively reasonable. Berry at **4. An employee's initial burden of articulating a reasonable accommodation need not be onerous.

12

Cehrs v. Northeast Ohio Alzheimer's Research Center, 155 F. 3d 775, 781 (6th Cir. 1998).  Once

the employee meets this burden, then the employer must prove that the accommodation is

unreasonable and imposes an undue hardship on the employer.  Cehrs, 155 F. 2d at 781; Berry at

**4.

In the present case, it is undisputed that after his injury Plaintiff was not qualified to

perform the essential functions of the lineman job (Docket No. 22 at 13).  It is also undisputed

that Defendant does not offer "light duty" work due to the safety sensitive functions of the job,

and thus, it is undisputed that Defendant could not have accommodated Plaintiff by placing him

in a light-duty lineman job (Docket No. 22 at 8).  Thus, the Court concludes that there is no

dispute between the parties that no "reasonable accommodation" was available which would

have allowed Plaintiff to perform the essential functions of his lineman position.

While it is undisputed that Plaintiff was not "otherwise qualified" to perform the essential

functions of the lineman job, the Court finds that there are facts in dispute whether Plaintiff

requested reasonable accommodation for his disability by requesting re-assignment to a light

duty clerical position, whether there were "light duty" positions available for which Plaintiff was

qualified, and whether Defendant's requirement that an injured employee receive a "full release

from the doctor" prior to returning to work is tantamount to a "100% healed" policy.  More

specifically, the record before the Court reflects that on December 7, 2004, Plaintiff informed

Defendant of his permanent restrictions, and expressed an interest in some "lighter type of job"

(Docket No. 22 at 16).  The record also reflects that on January 7, 2005, the parties met in the

president's office at Defendant's headquarters, and, while there is some question whether

Plaintiff expressed an interest in a meter reading position or a control center position and

13

whether Plaintiff needed to make application for any new position, it is undisputed that Kaprive told Plaintiff that she would contact him if jobs became available, and considered the control center position as maybe something Plaintiff could do, and qualified this offer by stating that Defendant had no job openings for him until he was released from medical care (Docket No. 22 at 19, 20 and 32). Furthermore, the evidence shows that Jennings also told Plaintiff that Defendant would give him first priority for any available job openings for which he was qualified (Docket No. 22 at 19). Finally, while it is disputed whether Bone communicated Plaintiff's interest in the position to Defendant, the record reflects that Plaintiff called Bone and told him that he would take the control center position (Docket No. 22 at 21). Thus, the Court finds that there are sufficient facts in dispute whether Plaintiff requested a reasonable accommodation for his alleged disability by requesting reassignment to a lighter duty position for which he was otherwise qualified to perform.

In addition, there are sufficient facts in dispute whether Plaintiff was denied a requested accommodation to a lighter duty position because of Defendant's alleged "100% healed" policy. The record reflects that on December 13, 2004, Defendant received a work status report from Kaelin indicating that Plaintiff could return to light duty work with restrictions, but that Defendant, while suggesting positions that Plaintiff may be able to perform, would not consider Plaintiff for any job position until Plaintiff had been fully released from Kaelin's care (Docket No. 22 at 19, 20 and 32). Defendant supports its policy by asserting that the safety sensitive nature of Defendant's business does not permit it to offer light duty positions until an employee has been fully released from medical care (Docket Nos. 20-4 at 25 and 25 at 5-7). While an employer is not required to create a light duty position where none exists and the ADA permits

14

job requirements that are job-related and consistent with business necessity, a "100% healed" or "fully healed" policy is a per se violations of the ADA.  See, Burch v. City of Nacogdoches, 174 F. 3d 615, 620-621 (5ᵗʰ Cir. 1999) (citing 42 U.S.C. §12113(a)); McGregor v. National R.R. Passenger Corp., 187 F. 3d 1113 (9ᵗʰ Cir. 1999).  "A 100% healed or fully healed policy discriminates against qualified individuals with disabilities because such a policy permits employers to substitute a determination of whether a qualified individual is 100% healed from their injury for the required individual assessment whether the qualified individual is able to perform the essential functions of his or her job either with or without accommodation." McGregor, 187 F. 3d at 1116.  Defendant explains its policy of not offering light duty work until an employing receives a full medical release as insuring that the employee "can do the essential functions of their job safely and not endanger anybody else." (Docket No. 25 at 5).  While this explanation of its "no light duty rule" appears consistent with the business necessity of providing a safe working environment for its employees, Defendant's refusal to consider Plaintiff for any job, including any job Plaintiff might have been fully qualified to perform given the restrictions placed upon by Kaelin, creates questions of fact whether Defendant has a "100% healed" policy or its functional equivalent.  Simply put, questions of fact remain whether Defendant's "full release from medical care rule" prohibited Plaintiff from being considered for positions for which he was qualified to perform, with or without accommodation, once released by Kaelin in December, 2004.

Finally, Defendant asserts that Plaintiff cannot establish his prima facie case of disability discrimination under the ADA because Plaintiff cannot show that Defendant took any adverse employment action against him solely because of his disability.  More specifically, Defendant

15

argues that it did not refuse to reassign Plaintiff to a position for which he was qualified, and at the time Plaintiff filed his EEOC charge, Defendant was engaged in an interactive process with Plaintiff to locate a suitable reassignment for him.  In addition, Defendant asserts that it is undisputed that it would have given Plaintiff priority for any positions for which he was qualified and applied once he was released from medical car, and the Plaintiff simply did not apply for any positions even though it had notified him of job openings.

The Court finds that given the dispute over whether Defendant had an impermissible "100% healed" rule which prohibited Plaintiff from being considered for positions for which he was qualified to perform, with or without accommodation, once released by Kaelin in December, 2004, questions of fact remain whether Plaintiff sustained an adverse employment action because of his disability.

Similarly, with respect to Plaintiff's claim of retaliation, Defendant asserts that Plaintiff cannot establish a prima facie case of retaliation, as a matter of law, because Plaintiff cannot show that he suffered any adverse employment action as a result of his exercise of a protected right.

In order to prove a claim of retaliation, Plaintiff must show that: 1) he participated in a protected activity, 2) he suffered an adverse employment action; and 3) that a causal connection existed between the protected activity and the adverse action.  Holt v. Olmsted Township Board of Trustees, 43 F. Supp. 2d 812, 826 (N.D. Ohio 1998); Penny, 128 F. 3d at 417.

Again, given the dispute over whether Defendant had an impermissible "100% healed" rule, questions of fact remain whether Plaintiff sustained an adverse employment action because of his disability.

16

Accordingly, given the facts in dispute, Defendant's Motion for Summary Judgment (Docket No. 13) is DENIED and Plaintiff's Motion for Summary Judgment (Docket No. 17) is DENIED.

IT IS SO ORDERED.


_____
TODD J. CAMPBELL
UNITED STATES DISTRICT JUDGE